UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ACCEPTANCE INDEMNITY INSURANCE COMPANY, | § § § | |
| *Plaintiff,* | § § | |
| | § | Civil Action No. 4:21-cv-801 |
| V. | § | |
| | § | JURY |
| THE LOCAL PUBLIC HOUSE, LLC D/B/A THE LOCAL PUBLIC HOUSE BAR & GRILL; CARLY PAIGE SHOCKEY, | § § § § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF ACCEPTANCE INDEMNITY INSURANCE COMPANY'S COMPLAINT FOR DECLARATORY JUDGMENT

On September 10, 2017, a mass shooter mercilessly killed eight people and severely injured Carly Paige Shockey ("Shockey") by shooting her in the face. Shockey sued the bar the shooter had left earlier in the day, The Local Public House, LLC d/b/a The Local Public House Bar & Grill ("LPH"), and alleged LPH negligently failed to stop the attack. Yesterday, a jury agreed and entered a verdict against LPH for $17,045,000.

Because that award is not covered by LPH's insurance policy with Acceptance Indemnity Insurance Company ("Acceptance") due to the policy's (1) Firearms Exclusion, (2) Assault and/or Battery Exclusion and (3) Abuse or Molestation Exclusion, plaintiff Acceptance files this complaint against

defendants LPH and Shockey to obtain a declaratory judgment establishing the lack of coverage.

## PARTIES

1.     Plaintiff Acceptance is a Nebraska corporation with its principal place of business in North Carolina.

2.     Defendant LPH is a Texas limited liability company with its principal place of business in Collin County, Texas. LPH's sole member is Heather Livingston, an individual resident and citizen of Collin County, Texas. Based on the foregoing, LPH has Texas citizenship. LPH may be served with process through its sole member and registered agent, Heather Livingston, 10102 Bettywood, Dallas, Texas 75243.

3.     Defendant Shockey is an individual resident and citizen of Collin County, Texas. Acceptance will request her counsel in the underlying litigation made the subject of this suit to accept service on her behalf. Formal service will follow if necessary.

## JURISDICTION AND VENUE

4.     Plaintiff's citizenship is diverse from defendants' citizenships and the amount in controversy exceeds $75,000, exclusive of interest and costs. Therefore, the Court has subject-matter jurisdiction over this lawsuit under 28 U.S.C. § 1332(a)(1).

5.     The Court has personal jurisdiction over defendants because they are Texas citizens.

6.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because the defendants are domiciled or reside in this district and division, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this lawsuit occurred in this district and division.

## FACTS

### The Mass Shooting and Related Suit

7.     This is a coverage dispute arising out of an underlying tort lawsuit over a September 10, 2017 mass shooting in Plano, Texas, that severely injured defendant Shockey and claimed the lives of eight others. The shooting took place at the home of Meredith Hight ("Meredith") (who became one of the fatalities) in the 1700 block of W. Spring Creek Parkway, and was committed by Ms. Hight's estranged husband, Spencer Hight ("Hight"). The police fatally shot Hight in the aftermath.

8.     Shockey sued LPH on the theory that it had an opportunity to prevent the shooting by its customer but failed to do so. A certified copy of Shockey's most recent original petition (the "Petition") in that underlying suit, Cause No. 416-05120-2019, *Carly Paige Shockey v. Local Public House, LLC d/b/a "The Local Public House" a Private Club, et al.*, In the 416th District Court of Collin County, Texas (the "Underlying Lawsuit"), is

attached as Exhibit 1 to this complaint.

***The Jury Verdict***

9.      The Underlying Lawsuit went to trial on September 27, 2021 and
the jury rendered its verdict yesterday, October 6, 2021, a copy is attached as
Exhibit 2 to this complaint. The jury found as follows (summarized, not
quoted verbatim):

1.      On the occasion in question, was Timothy Brandt Banks
acting within the course and scope of his employment with
Local Public House?

**Answer:** Yes.

2.      If "yes" to the previous question, did Timothy Brandt Banks
exercise control of Spencer Hight?

**Answer:** Yes.

3.      If "yes" to the previous question, did Spencer Hight commit
assault against the Plaintiff?

**Answer:** Yes.

4.      If "yes" to the previous question, did the negligence of
Timothy Brandt Banks proximately cause the injury in
question?

**Answer:** Yes.

5.      If "yes" to the previous question, assign percentages to any
of those you found to contribute to cause or injury. Find the
percentage of responsibility for

Spencer Hight

**Answer:** 80%

Timothy Brandt Banks

**Answer:** 20%

6. What sum would reasonably compensate the Plaintiff for available damages?

**Answer:** $85,225,000.

Because the jury – after finding Mr. Banks was acting within the course and scope of his employment with Local Public House and exercised control over Hight – allocated 20% of fault to Timothy Brandt Banks, the verdict, if sustained by the trial court without alteration, will result in a judgment against TPH of $17,045,000.

10. Post-trial activity is underway and a judgment is to follow. Acceptance will seek to amend or supplement this complaint with information on the judgment once the judgment is entered.

***Bases for this Declaratory Judgment Action***

11. Acceptance, a liability insurer of LPH, brings this action to seek a declaratory judgment establishing that the jury verdict and any resulting judgment in the Underlying Lawsuit are not covered under Acceptance's policy due to that policy's (1) Firearms Exclusion, (2) Assault and/or Battery Exclusion and (3) Abuse or Molestation Exclusion, so Acceptance does not owe LPH indemnity and does not owe Shockey payment.

12.    Acceptance also seeks a declaratory judgment establishing that because the allegations in the Petition fall within the same listed three exclusions, Acceptance does not owe LPH a defense.  Although Acceptance has been defending LPH in the Underlying Lawsuit, it has done so under a complete reservation of rights. Acceptance intends to terminate the defense (whether for post-trial proceedings in the trial court or on appeal) as soon as this Court has granted the declaratory judgment sought. Acceptance hereby notifies LPH of this intent through the filing and service of this complaint.

**The Policy**

13.    Acceptance issued commercial general liability policy number CP00164686 to LPH for the initial period of May 19, 2017 to May 19, 2018, later cancelled effective November 6, 2017 (the "Policy"). The Policy has a $1 million per occurrence limit, a $2 million aggregate limit and a $1,000 deductible. A true copy of the Policy is attached as Exhibit 3.

**The Firearms Exclusion**

14.    The Policy contains the following Firearms Exclusion by endorsement:

> This insurance does not apply to and we have no duty to defend or investigate any claims or "suits' for "bodily injury", "property damage", "personal injury" or medical payments arising from the use of firearms.

Exhibit 3 at 30.

6

15.   The Firearms Exclusion bars coverage for the jury verdict and any resulting judgment, as well as the allegations in the Petition, because all of those are predicated on bodily injury and medical payments arising from the use of firearms.

16.   Although the jury verdict itself is silent on the use of firearms, the undisputed evidence presented at the trial that led to verdict is that Hight used a firearm to cause Shockey's bodily injury and resulting medical payments. That evidence includes the following:

    a.   **<u>Shockey's own testimony</u>**. Shockey testified the shooting began after the Dallas Cowboys game had begun. The first thing she remembers is feeling a burning sensation in her cheek from a bullet entering through the right side of her face and exiting the left. She fell to the ground and "blacked out for ten seconds." She woke up and pretended to be dead because she heard gunshots and screaming. Next thing she remembers is hearing a man say, "I have eight gunshot victims." Shockey tried to raise her hand and say "help me, help me" but she had a broken jaw. She saw a bright flashlight and the next thing she remembers is waking up in the hospital.

    b.   **<u>Testimony of Andrea Medrano ("Medrano"), an eyewitness to part of the crime.</u>** Medrano was at Meredith's house on September 10, 2017, and is one of the few who survived. Medrano had been friends with Meredith since 2010 or 2011. She knew Hight but was never friends with him. Medrano was the second person to call 911. Medrano was on the back patio with friends and heard "fireworks." She then ran to the corner of the backyard and hid. Medrano did observe Hight enter through the front door. At one point, Hight came near the back door, and Medrano heard Meredith yelling, "Seriously? Are you serious?" Medrano testified that Hight remained quiet and then went back inside the house. Medrano called 911 but did not speak to them because Hight was nearby. She testified that she remained silent on the phone with 911 because she knew the police would show up if she remained on the line.

c. **Testimony of Officer Taylor Rust ("Rust") of the Plano Police Department, confirmed in part with dash cam video.** Rust was dispatched to the scene based on a report of a man with a knife and gun attempting to get into a residence. He authenticated dash cam footage depicting him pulling into the back alley after which multiple gun shots can be heard. The dash cam footage shows Rust jump out of his police car with his shotgun and try to find the source of the gunshots. More gunshots were then heard and Rust was able to follow the sounds to Meredith's house. There, he found near the back door of the house several individuals "lined up" that were shot. Rust then entered the house through the back door where he saw additional victims in the living room. He heard Hight's footsteps and immediately thereafter, Hight entered the living room with his rifle in ready position and looked directly at Rust. Rust instantly fired and fatally shot Hight because he "was not going to let [Hight] make any more decisions." Upon the arrival of additional officers, Rust "held cover" over Hight while the other officers checked and tended to the wounded. There were at least two non-injured survivors found. Shockey had been shot and was in the living room. The Texas Rangers investigated Rust's shooting of Hight and determined there was no officer misconduct and Rust acted appropriately. Rust received commendations from the Plano Police Department, the Department of Justice and President Trump.

d. **Testimony of Officer Jeffrey Fisher of the Plano Police Department.** Officer Fisher was one of the first responders the night of the shooting. He testified Hight acted alone and was the sole individual criminally responsible for the shooting.

e. **Testimony of Officer John Hoffman of the Plano Police Department.** Officer Hoffman was one of the first responding detectives to the shooting. He testified Hight was the only shooter involved in the deaths and shooting Shockey.

f. **Testimony of Lindsey Glass ("Glass"), confirmed in part with surveillance video and a 911 call recording.** Glass was a bartender for LPH on the day of the shooting and interacted with Hight before the shooting. Glass knew Hight prior to September 10, 2017, because Hight was a regular at LPH, coming in at least two to three times per week since before Glass began her employment. She had spoken with him many times and she also knew Meredith, who Glass described as her friend. Hight came to LPH two separate

times on the day of the incident, once around 2pm and then a few hours later. During the second visit, Hight displayed a clip and a small gun as confirmed by surveillance video. Based on this conduct and unusual statements by Hight while at LPH, Glass became concerned an went to Meredith's house where she saw Hight's vehicle. Glass's 911 call was played for the jury. Glass told the 911 operator that her friend was in danger, Hight was parked in the back alley, and Hight had a knife and gun that Glass saw at LPH. After Glass told the 911 operator to "please hurry," Glass returned to LPH where she remained on the phone with 911 for about 10 minutes. Glass testified she was not aware of the gravity of the situation until she saw and heard multiple first responders pass LPH en route to Meredith's house.

17.     There is no evidence in the trial record of the Underlying Lawsuit to contradict the foregoing or suggest that Hight injured Shockey with anything other than a firearm.

18.     As for the allegations in the Petition and the duty to defend, the Petition acknowledges Hight's use of firearm for the crime at paragraphs 3.28, 3.29 and 6.01. *See* Exhibit 1 at 10. Due to these express acknowledgments, with nothing stated to the contrary in the pleading, the Firearms Exclusion precludes Acceptance from owing a duty to defend.

### *The Abuse or Molestation Exclusion*

19.     The Policy has the following Abuse or Molestation Exclusion by endorsement:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

1.     The actual or threatened abuse or molestation by anyone or any person while in the care, custody or control of any insured, or

9

2.     The negligent:

a.     Employment;
b.     Investigation;
c.     Supervision;
d.     Reporting to the proper authorities, or failure to so report; or
e.     Retention;

Of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph 1 above.

Exhibit 3 at 58.

20.     The Abuse or Molestation Exclusion bars coverage for the jury verdict and any resulting judgment, as well as the allegations in the Petition, because all of those are predicated on both (1) Hight's threat of abuse while LPH had assumed control over him (the "Threat") and (2) the negligent failure to report Hight (a person for whom LPH became legally responsible, in Shockey's view, due to LPH's having assumed control over him) to the proper authorities (the "Negligent Reporting").

21.     While both the Threat (corresponding to exclusion paragraph 1) and Negligent Reporting (¶ 2.d.) predicated Shockey's underlying case, either suffices for the exclusion's applicability.

22.     Although the jury verdict itself is silent on the happening of the Threat and the Negligent Reporting, the evidence Shockey presented at the trial that led to verdict is not. Shockey's evidence for LPH having assumed

control (an element of both exclusion paragraphs and corresponding happenings) over Hight, for Hight having threatened abuse and for LPH having negligently failed to report to authorities, is as follows:

      a.     **Further testimony of Glass.** Again, Glass was a bartender for LPH on the day of the shooting and interacted with Hight, whom she knew, on the day of the shooting. On that day, after hearing from a customer that Hight had been spinning a knife, Glass asked Hight about the knife and Hight played it off like nothing was wrong and he had put it away. Glass later text messaged her colleague, Brandt Banks ("Banks") that Hight had a knife and had told her he had "dirty work to do," and subsequently texted "psychooooooo." Glass later text messaged Banks saying "he keeps saying he has to put someone in his place" and she was trying to "keep him here." (This, Shockey's counsel has consistently pled (see Petition at ¶¶ 3.03 and 3.22) and argued, is when Glass and LPH first assumed control over Hight).

            Glass testified Hight was "acting weird" and she text messaged Banks because if he came to LPH, she could go back to working while Banks could give him the attention she thought Hight needed. Glass told Banks she would have a beer waiting for him. Banks soon arrives and goes to sit with Hight on the patio. Glass testified when Banks first arrived, she told him about the gun. Banks's testimony, next addressed, takes up the story at this point.

      b.     **Testimony of Timothy Brandt Banks ("Banks"), a bartender at LPH.** Banks was a bartender at LPH at the time of the shooting. Banks had closed the night before the incident and was not scheduled to work on the day of the incident. Banks testified he had taken his two year-old son to get dinner and on the way back home, he received the first text from Glass. Because he was driving, he did not pay close attention to what Glass was saying, but he decided to head to LPH because Hight was his friend and he was concerned about him. He did not come to LPH to work.

            Banks testified that upon his arrival, he does not recall Glass

telling him Hight had a gun, but at that time he was concerned about getting his son settled before speaking with Hight. After another patron offered to watch his son, Banks went outside to the patio and spoke with Hight for approximately 30 minutes. Banks testified that he never saw Hight with a gun and did not know he had one until much later. Banks did see Hight had a knife and a clip – in fact, Hight was using the clip as a "fidget spinner" on the table. Upon seeing the clip, Banks told Hight "first and foremost get this shit out of here and put it in your car." Hight complied and thereafter, Hight and Banks went to Hight's car to put the knife and clip away. (This, Shockey's counsel has consistently pled (see Petition at ¶ 3.09) and argued, is the second instance in which LPH assumed control over Hight).

Hight and Banks went back to the LPH patio and at some point, Bank told Hight he couldn't let him leave and drive away. Banks testified that Hight appeared "buzzed but not intoxicated," and he tried to convince Hight to let him either call an Uber or have Hight come stay the night with him. (This, Shockey's counsel has consistently pled (see Petition at ¶ 3.12) and argued, was Banks and LPH affirmatively maintaining control over Hight).

Banks told Hight he was "not trying to call the cops" on him but while inebriated, he could not drive. Hight told Banks staying with him would not work because he had "to take care of some things tonight." Banks testified Hight was not in the best frame of mind so he "implored him to wait until tomorrow when he was not inebriated." (This, Shockey's counsel has consistently pled (see Petition at ¶ 3.13) and argued, was Banks and LPH's further effort to maintain control over Hight).

In an effort to get Hight to stay at LPH, Banks offered to buy him a beer. Hight mentioned he could not "do the things he needed to do" sober and at this point, Banks testified he was conflicted because he knew something was wrong, but Hight was compliant about putting away the knife and did not make any threats. Banks then told Hight he was going to go get his cell phone from his car and arrange for his son to be picked up. Banks instead called LPH's silent investor Jerry Owen for guidance. Owen told Banks to call the cops if he needed to. At this point, Banks saw Hight leave the patio. Banks testified he wanted to tackle Hight but it was illegal to do so and Owen encouraged Banks not to tackle him. (Owen's declining to

instruct Banks to take more aggressive action at this time, given the control Banks had established over Hight, was a negligent intervention by Owen. See Petition at ¶ 3.21). Banks then saw Hight "peel out" and turn in a direction opposite of Hight's residence.

Banks admitted he had the "last best chance" to prevent the shooting.

c.  **Testimony of Detective John Hoffman ("Hoffman") of the Plano Police Department**.  Hoffman was one of the first responding detectives to the shooting. Hoffman said when Glass and Hight were on the patio at LPH, it was "significant" because Hight "produced a gun." Hoffman testified Glass told Hight he could not have the gun, and he said it was "ok because it did not have a clip." Further, Hoffman testified it was a criminal violation for Hight to have a gun, possibly also a violation for the knife, because Chapter 46 of the Penal Code prohibits firearms in bars. Hoffman said the Penal Code does not specify if a magazine has to be loaded or not, but if more than 51% of an establishment's profits comes from alcohol sales, firearms are prohibited on the premises.

In Hoffman's opinion, if Glass or Banks had called the police on Hight earlier, the police would have taken him to jail for public intoxication, and if they intervened enough, Hight would have been charged with a third degree felony for the weapons. Hoffman feels that "all the parts were there" because Glass saw a handgun (Hight told her no clip) and Banks saw a clip (Hight told him no gun).

According to Hoffman, the Plano Police Department prides itself on their quick response time, and in his opinion, if Glass called the police about Hight possessing a gun and knife at any point before Hight left LPH, Plano Police's "standard operating procedures" would have resulted in them arriving quickly, and thus preventing the shooting.

Hoffman testified that if Glass would have called the cops earlier, "8 young innocent people would not have died, Spencer Hight would not have died, Carly Shockey would not have been injured, and the escapees would be dealing with the issues they are dealing with."  Further, if called to the bar earlier, Hight could have committed a crime in the future with more or less

victims, and there could have been a struggle with the cops at the bar where someone would have been hurt, "but all those people would not have died."

23.     Although LPH disputed this evidence and Shockey's related arguments, the jury sided with Shockey in its verdict.

24.     As for the allegations in the Petition and the duty to defend, the Petition alleges the happening of the Threat and Negligent Reporting at the paragraphs noted in the several parenthetical citations above. Due to these express allegations, with nothing stated to the contrary in the pleading, the Abuse or Molestation Exclusion precludes Acceptance from owing a duty to defend.

***The Assault and/or Battery Exclusion***

25.     The Policy contains the following Assault and/or Battery exclusion by endorsement:

> This insurance does not apply to:
>
> > A.     Any claims arising out of Assault and/or Battery, including actual or alleged Sexual Assault and/or Sexual Battery; or
> >
> > B.     Any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of you, your employees or volunteers, patrons or any other persons; or
> >
> > C.     Claims, accusations or charges of negligent hiring, placement, training or supervision arising from any of the foregoing are not covered.

> We shall have no obligation to defend you, or any other
> insured, for any such loss, claim or suit.

Exhibit 3 at 10.

26.     The Assault and/or Battery exclusion bars coverage for the jury

verdict and any resulting judgment, as well as the allegations in the Petition,

because all of those are predicated on (1) Hight's assault of Shockey (the

"Assault"); (2) acts or omissions in connection with the prevention or

suppression of that assault, caused by or at the instigation or direction of

LPH, its employees (Glass and Brandt) and patron (Hight) (the "Prevention

Failures"); and (3) claims of negligent training or supervision (including the

lack of needed policies and procedures) arising from the foregoing (the

"Negligent Supervision").

27.     While the Assault (corresponding to exclusion paragraph A), the

Prevention Failures (¶ B) and the Negligent Supervision (¶ C) all predicate

Shockey's case to the jury, any one of them suffices for the exclusion's

applicability.

28.     The jury expressly found that Hight assaulted Shockey (fulfilling

exclusion paragraph A) and that Banks, a TPH employee, failed to prevent

the assault (fulfilling exclusion paragraph B). To rephrase the jury's lead

findings as a single sentence, Timothy Brandt Banks, while acting within the

course and scope of his employment with Local Public House, exercised

control of Hight, who committed assault against Shockey, so the negligence of Timothy Brandt Banks (again, TPH's employee) proximately caused Shockey's injury. Without the assault, there would have been no injury and no claim. Without the failure to prevent the assault, there would be no basis for imposing liability on TPH. Exclusion paragraphs A and B both apply to bar coverage.

29.    Exclusion paragraph C also applies. Though the verdict is silent on Negligent Supervision, the evidence presented at trial that led to the verdict is not. Shockey's evidence for Negligent Supervision (including lack of necessary policies and procedures) includes the proof discussed above for the Threat and Negligent Reporting, and the following additional testimony:

a.  **Further testimony of Glass.** Glass testified that LPH had no rules or training regarding security or calling the police. Glass testified it was not her job to manage the bar or handle security- her job was merely to serve drinks to customers. Glass testified that she was in the course and scope of her employment the night of the incident and that "everything she didn't do" was also in the course and scope of her employment.

Glass testified she had bartended at two to three other places before LPH and none of the establishments she worked at had policies, procedures, or training concerning penal codes, how to handle customers who have weapons, recognizing mental illness, or recognizing when customers are in crisis.

b.  **Testimony of Heather Livingston ("Livingston"), the owner of LPH**. Livingston testified LPH did not provide employees with policy and procedure manuals regarding safety, customers with weapons, or regarding any other matter. The only required policies and procedures LPH had for employees were those required by TABC. There was no training on what employees should do if a customer said they had "dirty work to do" because that had never

> happened before. Instead, employees were instructed to call Livingston if there was a problem with the bar and to call the police if there was a dangerous situation. At the time of the incident, Livingston was the "manager" of the bar and it was normal for one bartender and one cook to be working at LPH. Livingston also owned/managed two other bars/restaurants in the DFW area at the time.

30.     Although LPH disputed this evidence and Shockey's related arguments, the jury sided with Shockey in its verdict.

31.     As for the allegations in Shockey's Petition and the duty to defend, the Petition alleges the happening of the Assault and the Prevention Failures throughout the pleading, and the Negligent Supervision at paragraphs 5.01.01, 5.01.05, 5.03.01, 5.03.02 and 5.03.03. *See* Exhibit 1. Due to these express allegations, with nothing stated to the contrary in the pleading, the Assault and/or Battery exclusion precludes Acceptance from owing a duty to defend.

## <u>COUNT 1 – DECLARATORY JUDGMENT AS TO INDEMNITY</u>

32.     Acceptance brings this claim for declaratory judgment under both Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201-2202.

33.     Acceptance seeks a declaration that the damages awarded by the jury in the Underlying Lawsuit are not covered under the Policy and that Acceptance does not have a duty to indemnify LPH or pay Shockey.

34.     The Firearms Exclusion precludes coverage because Hight's use of a firearm to cause Shockey's injury and resulting medical payments is established by undisputed evidence at trial.

35.    The Abuse or Molestation Exclusion precludes coverage because Shockey predicated her Underlying Lawsuit on, and presented affirmative evidence of, the Threat (corresponding to exclusion paragraph 1) and Negligent Reporting (¶ 2.d.), and either suffices for the exclusion to apply.

36.    The Assault and/or Battery exclusion precludes coverage because the jury expressly found Assault (corresponding to exclusion paragraph A) and Prevention Failures (¶ B), and Shockey predicated her Underlying Lawsuit on, and presented affirmative evidence of, Negligent Supervision (¶ C), any one of which suffices for the exclusion to apply.

37.    Although all three exclusions apply, any one of them suffices to preclude coverage for the jury verdict and any resulting judgment.

## COUNT 2 – DECLARATORY JUDGMENT AS TO DEFENSE

38.    Acceptance seeks a declaration that Shockey's allegations in the Underlying Lawsuit are not covered under the Policy and that Acceptance does not have a duty to defend Shockey.

39.    The Firearms Exclusion precludes coverage because Hight's use of a firearm to cause Shockey's injury and resulting medical payments is expressly alleged without contradiction in the Petition and predicates the entire Underlying Lawsuit.

40.    The Abuse or Molestation Exclusion precludes coverage because Shockey expressly alleged in the Petition, without contradiction, and

predicated the Underlying Lawsuit upon, the happening of the Threat (corresponding to exclusion paragraph 1) and Negligent Reporting (¶ 2.d.), and either suffices for the exclusion to apply.

41.     The Assault and/or Battery exclusion precludes coverage because Shockey expressly alleged in the Petition, without contradiction, and predicated the Underlying Lawsuit upon, the happening of the Assault (corresponding to exclusion paragraph A), the Prevention Failures (¶ B) and the Negligent Supervision (¶ C), any one of which suffices for the exclusion to apply.

42.     Although all three exclusions apply, any one of them suffices to preclude coverage and negate any duty to defend of Acceptance.

## **JURY DEMAND**

43.     Acceptance demands a trial by jury on all issues of fact, if any.

## **CONCLUSION AND PRAYER**

For the reasons stated above, the Policy affords no coverage for the jury verdict in the Underlying Lawsuit, and Acceptance asks the Court for:

  a.     a declaration that Acceptance does not have a duty to indemnify LPH or pay Shockey;

  b.     a declaration that Acceptance does not have a duty to defend LPH;

  b.     costs of Court; and

c.   all other relief to which Acceptance may show itself to be justly entitled.

Respectfully submitted on October 7, 2021:

*/s/ Joseph A. Ziemianski*
Joseph A. Ziemianski
Lead Attorney
Texas State Bar No. 00797732
Bryan P. Vezey
Texas State Bar No. 00788583
COZEN O'CONNOR
1221 McKinney, Suite 2900
Houston, Texas 77009
Telephone:  (832) 214-3900
Telecopier:  (832) 214-3905
E-mail: jziemianski@cozen.com
E-mail: bvezey@cozen.com

ATTORNEYS FOR PLAINTIFF,
ACCEPTANCE INDEMNITY INSURANCE
COMPANY